HEINZ MOLSEN, JR., AND CHRISTINA T. MOLSEN, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 22699–82, 22700–82, 22701–82, 22702–82.　　Filed September 26, 1985.

*Robert W. Ryan, Jr.*, and *Paul E. Pesek*, for the petitioners.*
*William B. Lowrance*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined deficiencies in the petitioners' Federal income taxes for 1977 as follows:

---

[1]Cases of the following petitioners are consolidated herewith: Frederick G. Molsen and Jayne F. Molsen, docket No. 22700–82; Peter F. Kandel and Barbara M. Kandel, docket No. 22701–82; and Elizabeth Molsen, docket No. 22702–82.

*Brief amicus curiae was filed by Neil P. Gillen, vice president and general counsel of the American Cotton Shippers Association.

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 22699–82 | Heinz Molsen, Jr., and Christina T. Molsen | $243,048 |
| 22700–82 | Frederick G. Molsen and Jayne F. Molsen | 243,048 |
| 22701–82 | Peter F. Kandel and Barbara M. Kandel | 243,047 |
| 22702–82 | Elizabeth Molsen | 40,483 |

The issues for decision are: (1) Whether the Commissioner abused his discretion under section 446(b) of the Internal Revenue Code of 1954[2] in determining that a cotton merchant that values its ending inventory at market may not accrue an estimated liability at yearend for cotton purchased under on-call contracts where the cotton has been delivered but the price has not yet been fixed, and (2) whether the petitioners are entitled to an award of costs and attorneys' fees.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

All of the petitioners maintained their legal residences in Dallas, Texas, at the time they filed their petitions in these consolidated cases. All filed their Federal income tax returns for 1977 with the Internal Revenue Service Center, Austin, Texas. All filed their petitions in this Court on September 10, 1982.

H. Molsen & Co., Inc. (Molsen & Co. or the company), is a cotton merchant engaged in the business of buying and selling cotton throughout the world. Originally formed as a partnership in 1928, Molsen & Co. was incorporated under the laws of the State of Texas in 1966. It has maintained its principal place of business in Dallas, Texas, since its incorporation. During 1977, Molsen & Co. was an electing subchapter S corporation for Federal income tax purposes, and its outstanding shares of stock were owned as follows:

---

[2]All statutory references are to the Internal Revenue Code of 1954 as in effect during 1977, unless otherwise indicated.

| Shareholder | Number of shares |
|---|---|
| Heinz Molsen, Jr | 2,250 |
| Frederick G. Molsen | 2,250 |
| Barbara M. Kandel | 2,250 |
| Elizabeth Molsen | 375 |

Heinz Molsen, Jr., Frederick G. Molsen, Barbara M. Kandel, and Elizabeth Molsen will sometimes be referred to as the petitioners.

As a cotton merchant, Molsen & Co. purchases cotton from farmers, ginners, and other merchants and then resells the cotton to domestic and foreign textile mills and, occasionally, to other merchants. Cotton is planted between March and June and is harvested from late July to January. The traditional cotton crop year, or season, runs from August 1 to July 31, but cotton merchants buy and sell cotton throughout the year.

There are two basic methods of purchasing cotton: the "spot purchase" and the "forward purchase." In a spot purchase, the cotton is available for immediate delivery to the buyer. In a forward purchase, the seller contracts to deliver the cotton to the buyer at a specified future date.

Both spot purchases and forward purchases can be made at either "fixed" or "on call" prices. In a fixed price contract, the price per pound of cotton is established or "fixed" on the day the agreement is entered into by buyer and seller. In an on-call contract, the price remains open or "on call" until the seller exercises a call right granted by the contract. The purchase price is ultimately determined by a formula tied to the market price of cotton: the contract price is a specified number of "points"[3] above or below the futures price for the base quality cotton[4] traded on the New York Cotton Exchange for a particular month for future delivery. Such price is then adjusted to reflect any difference in quality between base quality cotton and the cotton actually delivered under the contract. Cotton is traded on the futures market for the months of March, May, July, October, and December. The seller may exercise the call right at any time between the execution of the contract and the day preceding the first

---

[3] A "point" is one/one-hundredth of a cent.

[4] The term "base quality cotton" refers to the type of cotton traded on the New York Cotton Exchange: strict low middling 1-1/16 inch staple length with a micronaire of 3.5 through 4.9.

"notice day" of the designated call month. The first notice day generally falls on about the fifth day preceding the first day of the call month. For example, on December 8, 1977, Molsen & Co. entered into an on-call purchase contract which provided for a contract price of "850 points off[5] July 1978, futures price at time of seller's fixation." Under the contract, the seller had until about June 25, 1978, to call and fix the price, and he would receive a price per pound of 8.5 cents less than the July futures price on the day he exercised the call. If the seller failed to exercise the call, the price would be determined by reference to the futures settlement price at the close of the last day before the first notice day of a July 1978 futures contract. In a large purchase, Molsen & Co. might permit the seller to call the price in increments of 100 bales per call, with the result that the price of the entire contract would not be fixed until the seller made several calls or the first notice day arrived. Cotton bought on call and delivered to the cotton merchant may be resold by the merchant long before the original seller fixes the price and receives payment in final settlement of the contract.

In most on-call cotton purchases, the price is a specified number of points off (below) the futures market price. All of the Molsen & Co. on-call purchase contracts at issue here provided for a price off the price of July 1978 futures. The exact price terms of on-call cotton purchase contracts are influenced by a competitive marketplace. Molsen & Co. bases the price terms of its on-call purchase contracts on the difference between the spot price and the futures price existing at the time it enters into the contract. The "spot price" of cotton is the price at which cotton can be purchased for cash in the open market for immediate delivery. The difference on any given day between the spot price of cotton and the futures price for cotton traded on the New York Cotton Exchange for a particular month is called the "basis." For example, if on December 1, 1977, the spot price of cotton was 45 cents per pound and the market price for July 1978 futures was 50 cents per pound, the basis would have been 5 cents (500 points). The basis fluctuates over time but not to the

---

[5]A price "off" a futures month refers to a price the specified number of points below the futures price. A price "on" a futures month refers to a price the specified number of points above the futures price.

same extent as the futures price, which may fluctuate by as much as 2 cents per pound in a single day. By looking to the basis existing at the time it enters into an on-call contract, Molsen & Co. determines the price terms of the contract; in our example, the price formula would be 500 points off July 1978 futures.

Under an on-call purchase contract, the cotton merchant may or may not agree to make a provisional payment, or advance, to the seller upon delivery of the cotton, with the balance (if any) to be paid when the seller fixes the price. Delivery is made by transferring a negotiable warehouse receipt for each bale of cotton sold. The transfer of the warehouse receipts also effects the transfer of legal title to the cotton. The amount of the provisional payment is determined in different ways depending on where the cotton is purchased: in some areas of the country, farmers demand a provisional payment bearing some relation to the amount that they would receive if they pledged their cotton in return for an agricultural loan from the Federal Government; in other areas, farmers request a provisional payment determined under a formula tied to the futures market. If the seller receives a provisional payment, he is paid any balance due him when he fixes the price.

The on-call purchase contract has been used since the 1930s. It arose in response to the introduction of a Federal Government price-support program for cotton farmers under which the Secretary of Agriculture establishes loan values for cotton based on the grade, staple, and micronaire of the cotton. The base quality cotton for the Government loan program is the same as the base quality cotton traded on the New York Cotton Exchange. The Government loan program affords the farmer the opportunity to pledge his cotton to the Government in return for the receipt of the Government loan value for such cotton, thereby creating a floor or minimum price for the cotton. For the next 10 months (in some cases, 18 months), the farmer has the right to redeem his cotton from the Government by paying back the loan value received, plus the accrued carrying charges for interest, storage, and insurance. If he redeems the cotton, the farmer is free to sell it on the open market at the then-prevailing market price. If he fails to redeem the cotton, the farmer has, in effect, sold his cotton to

the Government at a price equaling its loan value. Thus, participation in the Government loan program guarantees the farmer a minimum price while allowing him to wait 10 or 18 months for a rise in the market value of his cotton which would enable him to get a higher price. In the past, during periods in which the spot price of cotton has approximated the loan value of such cotton, farmers tended to participate in the Government loan program in hopes of a rise in the market. As farmers pledged their cotton under the loan program, it became difficult for cotton merchants and textile mills to buy cotton. Therefore, to secure themselves a supply of inventory, they instituted the on-call purchase contract. The on-call purchase contract is more advantageous to farmers than the Government loan program because it permits farmers to secure the full benefit of a market rise without having to pay any carrying charges.

As a general rule, farmers sell their cotton under on-call contracts when the spot, or market, price of cotton is close to its Government loan value. Conversely, when the spot price of cotton is high, well above its loan value, farmers tend to want to "lock in" the high price through a fixed price contract. From the end of World War II up to about 1970, and particularly during the 1960s, the Government maintained cotton loan values (and thus cotton prices) at a very high level. Large cotton surpluses developed as farmers began, in effect, to grow cotton for the loan. The spot price of cotton stayed at the loan level, and the cotton export market dried up. On-call purchases were infrequent because it was unlikely that the futures price of cotton would rise above the loan level. In the early 1970s, the Federal Government began an extensive program to dispose of its surplus, to cut back on cotton acreage, and to move toward a free market system. As the surpluses disappeared, the cotton markets moved away from the support prices, and with the increasing risk of market fluctuations, the futures market became more active and the number of on-call purchases and sales became significant. In 1977 and at the time of trial, use of the on-call purchase contract was a common, accepted, and industry-wide practice.

Cotton merchants, including Molsen & Co., may engage in hedging transactions with respect to their fixed price purchases and fixed price sales. Fixed price contracts may be

hedged by entering into an offsetting transaction in the cotton futures market. Thus, if a cotton merchant purchases 100 bales of cotton at a fixed price, the merchant would sell one contract (which consists of 100 bales) on the cotton exchange for future delivery. Cotton merchants do not hedge unfixed, on-call purchases.

Molsen & Co. has always reported its income on a calendar year basis for Federal income tax purposes. It uses a fiscal year ending July 31 for financial reporting purposes. Technically, Molsen & Co. employs a hybrid method of accounting: the day-to-day operations of the company are recorded on a cash basis, but at yearend, adjusting entries are made to all material accounts (such as accounts receivable, accounts payable, and purchases) to effectively place the company on an accrual basis for income tax purposes.

Molsen & Co. uses inventories and computes its cost of goods sold by adding the year's cotton purchases to opening inventory—thereby indicating the total cost of goods available for sale—and then subtracting ending inventory. The ending inventory consists of sold and unsold cotton to which the company has title at yearend. The company values its ending inventory at "market": inventory under a sales order (i.e., sold but not yet delivered) is valued at the contract sale price less certain (unspecified) charges; unsold inventory is valued at its current market value, determined by reference to several factors, including daily spot price quotations published by the Department of Agriculture and the price of futures contracts traded on the New York Cotton Exchange. The market value so determined may be higher or lower than the actual cost of the cotton inventory. A year's ending inventory figure is used as the opening inventory figure in the following year.

Cotton purchases are accounted for at cost under an accrual method: during the course of the year, the purchases account is debited by the amounts paid under fixed price contracts, advanced as provisional payments under delivered, on-call contracts, and paid in final settlement of delivered, on-call contracts that have been fixed by the end of the year; at yearend, in the event of a rising market, Molsen & Co. accrues an additional amount to the purchases account (by debiting purchases and crediting accounts payable) to account for the additional money potentially due to sellers under delivered,

on-call purchase contracts that have not yet been fixed.[6] Cotton merchants sometimes refer to this accrual calculation as bringing the unfixed, delivered, on-call purchases "to market," but in fact, the purchase obligations are not accrued at the yearend market (or spot) value of the purchased cotton. Rather, the amount of the accrual is determined in accordance with the price terms of each unfixed, delivered, on-call purchase contract, in light of the market price on December 31 of futures of the designated call months: generally, Molsen & Co. calculates the amount that it owes under the contracts (without regard to amounts previously advanced as provisional payments) as if the sellers had elected to call and fix the prices on December 31, and then accrues the difference between such amount and the provisional payments.[7] Although the accrual technically does not peg the cost of unfixed, delivered, on-call purchases at the yearend market value of cotton, we may hereinafter refer to the accrual as bringing such purchases "to market" for brevity's sake and because the purchase cost as accrued is tied to the yearend market price of futures.

Molsen & Co. reverses the yearend accruals for unfixed, delivered, on-call purchases shortly after the start of the following year by debiting accounts payable and crediting the purchases account. Reversing the accrual entries prevents the duplication in the following year of the previously accrued cost of such purchases. When each seller actually fixes the price of his cotton, Molsen & Co. pays the difference between the called price and the amount provisionally advanced, and it debits the purchases account and credits the cash account for the additional amount paid.

Molsen & Co. has always valued its inventory at market. Likewise, the company has always accrued a liability to its purchases account at yearend for the unpaid balance (if any) due under unfixed, delivered, on-call purchase contracts. These adjustments are made for financial accounting purposes

---

[6]In the event that the cotton market falls by yearend to the point where the provisional payment exceeds the amount due the seller under an unfixed, delivered, on-call purchase contract on Dec. 31, and assuming that the provisional payment is not a guaranteed minimum price, Molsen & Co. would, theoretically, credit the purchases account and debit accounts receivable by the amount of such difference due it by the seller. However, there is no evidence that Molsen & Co. has ever experienced this situation.

[7]As will be discussed in the text, *infra*, Molsen & Co. calculated the accrual in slightly different ways for the two groups of its delivered, on-call purchases that were unfixed on Dec. 31, 1977, and employed certain average figures in its computations.

as well as for tax accounting purposes. However, due to the fact that the cotton season ends on July 31 of each year, Molsen & Co.'s inventory is much lower at the close of its fiscal year on July 31. Furthermore, the company rarely has any unfixed, delivered, on-call purchases at the close of its fiscal year because it typically ends the season with on-call purchases based on July futures; in only a few, isolated instances has cotton been delivered and sold to Molsen & Co. on-call in one season based on October futures, which falls in the next season. Consequently, no adjustment is usually necessary in the preparation of the company's financial statements to accrue amounts potentially owing on unfixed, delivered, on-call purchases. None of the company's delivered, on-call purchases remained unfixed on July 31, 1978.

Molsen & Co.'s method of accounting for its cost of goods sold conforms to generally accepted accounting principles and to longstanding industry-wide practice. Most, if not all, cotton merchants value their yearend inventories at market for financial and tax accounting purposes, and this practice has been explicitly recognized and permitted by the Commissioner since 1926. Likewise, most, if not all, cotton merchants bring their unfixed, delivered, on-call purchases to market if they have any at the end of their fiscal or taxable years. Unlike Molsen & Co., many cotton merchants, either before or since 1977, have adopted identical years for tax and financial reporting purposes and have selected years corresponding more closely to the traditional cotton season—for example, years ending on May 31, June 30, July 31, or August 31. Such merchants rarely have unfixed, delivered, on-call purchases to bring to market at the end of their taxable years. However, such purchases are brought to market on interim financial statements prepared during the course of the year for company use or to secure bank financing.

Cotton merchants sell cotton on-call in addition to buying cotton on-call. An on-call sale operates much like an on-call purchase; all particulars of the transaction are fixed with the exception of the price, which remains "on-call." The price is a negotiated number of points on or off the price of a futures contract for a call month traded on the New York Cotton Exchange. In an on-call sale, unlike an on-call purchase, the buyer (typically a textile mill) has the call, which may be

exercised anytime between the execution of the contract and the first notice day of the call month. Some cotton merchants receive a provisional payment and ship the cotton to the buyer before the price has been fixed. Where the price of cotton sold and delivered on-call has not been fixed by yearend, cotton merchants bring the sale "to market" at the close of the year by accruing the amount that would be due it if the buyer had elected to call the price on the last day of the year. Molsen & Co. engages in on-call sales, but does not, as a rule, ship cotton to a buyer before the buyer has fixed the price. Consequently, Molsen & Co. normally has no unfixed, delivered, on-call sales contracts at yearend; in the event that the company does, it brings such sales to market in the same manner as it brings its on-call purchases to market. Apparently, Molsen & Co. and other cotton merchants do not accrue unfixed, on-call sales at yearend where the cotton has not yet been shipped; but, since the merchants have title to such cotton at the end of the year, it is included in ending inventory at its market value.[8]

In 1977, Molsen & Co. purchased 1,199,915 bales of cotton, of which 1,060,990 were purchased in the United States. On December 31, 1977, the price of 37,706 bales bought on-call and delivered to the company remained unfixed. Such on-call purchases are divisible into two groups: the Texas contracts, totaling 17,021 bales, and the Memphis territory[9] contracts, totaling 20,685 bales. Each of the Texas and Memphis territory contracts provided for a price of a specified number of points off July 1978 futures, with adjustments for grade, staple, and micronaire, and each of the contracts provided for a provisional payment. Under a Texas contract, the provisional payment equaled the Government loan value of the cotton less a 50 point "invoicing and outturn charge," and constituted a guaranteed minimum price for the cotton. The Texas farmer was therefore guaranteed the cotton's loan value in the event of a subsequent decline in the futures market. Under some of the Memphis territory contracts, the provisional payment was

---

[8]It is not clear from the record whether cotton merchants treat such cotton as "sold" cotton (sold but undelivered) that is valued at its sales price or as "unsold" cotton that is valued at its market value. If such cotton is viewed as sold, it is presumably necessary to determine its sales price as if the price was fixed on the last day of the year—just as the merchants calculate the accrual to sales for unfixed, delivered, on-call sales.

[9]The Memphis territory includes the States of Tennessee, Arkansas, Louisiana, Mississippi, and Missouri.

40 cents per pound regardless of the actual loan value of the delivered cotton, whereas under the remaining contracts, the provisional payment equaled the Government loan value. Except for two contracts, the provisional payment advanced under a Memphis territory contract was not a guaranteed minimum price.

Molsen & Co. filed a Small Business Corporation Income Tax Return for the calendar year 1977 on which it reported gross sales, cost of goods sold, and gross profit from sales as follows:

| | |
|---|---|
| Gross sales | $325,894,477 |
| Less: Returns and allowances | 2,296,266 |
| | 323,598,211 |
| Less: Cost of goods sold | 317,078,994 |
| Gross profit from sales | 6,519,217 |

The company reported total income of $6,772,017, and after subtracting deductions totaling $5,356,303, reported taxable income of $1,415,714.

The company's cost of goods sold, as reported on its 1977 return, was computed as follows:

| | |
|---|---|
| Beginning inventory | $104,323,282 |
| Plus: Purchases | 251,095,008 |
| | 355,418,290 |
| Plus: Freight | 8,149,007 |
| Compress charges and controlling fees | 6,042,641 |
| Interest and exchange | 4,292,541 |
| Insurance on cotton | 824,411 |
| Purchase commissions | 268,681 |
| Customs and duties | 48,579 |
| | 375,044,150 |
| Less: Ending inventory | 57,965,156 |
| Cost of cotton sold | 317,078,994 |

In computing the value of its ending inventory, Molsen & Co. valued unsold inventory at its market value on December 31, 1977, and sold-but-undelivered inventory at its sales price. The price of cotton and cotton futures was rising at the end of 1977. By December 31, 1977, the price of July 1978 futures for base quality cotton had risen to 55.40 cents per pound. To bring unfixed, delivered, on-call purchases to market on December 31, 1977, Molsen & Co. accrued an additional $1,099,464.58 to its purchases account, consisting of $189,324.58 that would have been due under the Texas contracts and $910,140 that

would have been due under the Memphis territory contracts had the sellers under such contracts fixed their prices on December 31. The additional $1,099,464.58 was then included in the purchases figure to increase the company's cost of goods sold by such amount and to reduce its gross profit and taxable income by such amount.

Molsen & Co. employed different methods to calculate the amounts potentially due under the Texas and Memphis territory contracts. In computing the accrual for the Texas contracts, the company first determined that the weighted average of the different buying bases (the number of points off July 1978 futures) provided in the Texas contracts was 853 points, or 8.53 cents, per pound. The company then deducted 8.53 cents from 55.40 cents, the December 31, 1977, price of July 1978 futures, to arrive at a price of 46.87 cents per pound for base quality cotton. The difference between 46.87 cents and the loan value of base quality cotton in Texas, 44.60 cents per pound, was 2.27 cents. By multiplying 2.27 cents by 8,340,290 pounds (the approximate weight of 17,021 bales of Texas cotton[10]), the company arrived at $189,324.58 as the amount that it would have owed in addition to the previously advanced provisional payments if the Texas contracts had been called on December 31, 1977. To compute the accrual for the Memphis territory contracts, the company separately determined the amount per pound potentially due under each contract by subtracting the provisional payment actually advanced from the price on December 31, 1977, as determined in accordance with the contract. The average amount due was 880 points, or 8.8 cents, per pound. By multiplying 8.8 cents by 10,342,500 pounds (the approximate weight of 20,685 bales of Memphis territory cotton[11]), the company determined that it would have owed $910,140 more if the sellers had fixed their prices on December 31, 1977.

All of the sellers under the Texas and Memphis territory contracts exercised their call rights and fixed their prices by June 23, 1978; Molsen & Co. paid approximately $1,839,633.70 in 1978 in final settlement of the Texas and Memphis territory contracts.

---

[10]A bale of Texas cotton weighs approximately 490 pounds.

[11]A bale of Memphis territory cotton weighs approximately 500 pounds.

The petitioners reported their distributive shares of Molsen & Co.'s reported taxable income on their Federal income tax returns for 1977. In his notices of deficiency, the Commissioner determined that Molsen & Co. could not bring its unfixed, delivered, on-call purchases to market on December 31, 1977, by accruing $1,099,465 to purchases in computing its cost of goods sold, because, on December 31, 1977, such purchase contracts were open-ended contracts under which Molsen & Co. had only a contingent liability for additional costs. The Commissioner therefore limited purchases to the $249,995,543 actually paid by Molsen & Co. in 1977 and increased the company's taxable income by $1,099,465. There is no evidence that the Commissioner changed the company's method of valuing opening and ending inventories at market.

OPINION

Section 446 provides that taxable income shall be computed under the method of accounting regularly used by the taxpayer in computing his income and keeping his books, but if no method has been regularly used by the taxpayer or if "the method used does not clearly reflect income," the computation shall be made under such method as, in the opinion of the Commissioner, does clearly reflect income. The term "method of accounting" includes not only the taxpayer's overall method but also the accounting treatment of any item. Sec. 1.446-1(a)(1), Income Tax Regs. Molsen & Co., a cotton merchant, accounts for its taxable income on an accrual basis and employs a taxable year ending December 31. In accordance with generally accepted accounting principles and industry-wide practice, the company has historically and consistently accounted for its cost of goods sold by valuing ending cotton inventory at market and accruing to the cost of purchases the additional amount that would be payable by it under its unfixed, delivered, on-call purchase contracts were the cost of such purchases fixed on December 31. Since 1926, the Commissioner has expressly permitted cotton merchants and other dealers in commodities to value their ending inventories at market value even though market value may exceed the inventories' actual cost. See Rev. Rul. 74-227, 1974-1 C.B. 119, which updated, restated, and superseded S.M. 5693, V-2 C.B. 20 (1926). However, the Commissioner has recently ruled that

cotton merchants may not include the additional amounts (if any) payable under on-call purchase contracts in the cost of cotton purchases unless the cotton producers have called the prices during the taxable year. Rev. Rul. 81–298, 1981–2 C.B. 114.[12] The primary issue for decision is therefore whether Molsen & Co.'s method of accounting for its unfixed, delivered, on-call purchases clearly reflects its income so that the Commissioner was arbitrary and abused his discretion in determining that the company's method should be changed.

Section 446 vests the Commissioner with wide discretion in determining whether a particular method of accounting clearly reflects income, and a heavy burden is imposed upon the taxpayer to overcome a determination by the Commissioner in this area. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532 (1979); *United States v. Catto*, 384 U.S. 102, 114 (1966); *Commissioner v. Hansen*, 360 U.S. 446, 467 (1959); *Lucas v. Structural Steel Co.*, 281 U.S. 264, 271 (1930). However, it is a well-established principle that the Commissioner cannot require a taxpayer to change from an accounting method which clearly reflects income because the Commissioner considers an alternate method to more clearly reflect income. See, e.g., *St. James Sugar Co-op, Inc. v. United States*, 643 F.2d 1219 (5th Cir. 1981); *Bay State Gas Co. v. Commissioner*, 75 T.C. 410, 417 (1980), affd. 689 F.2d 1 (1st Cir. 1982); *Auburn Packing Co. v. Commissioner*, 60 T.C. 794, 798–800 (1973); *Garth v. Commissioner*, 56 T.C. 610, 618 (1971).

Gross income, in a merchandising business, means total sales less cost of goods sold (the gross profit from sales), plus any income from investments and from incidental or outside operations and sources. Sec. 1.61–3, Income Tax Regs.; Form 1120. The cost of goods sold during a year is determined by subtracting inventory on hand at the end of the year from the total inventory on hand at the beginning of the year and the cost of purchases. Schedule A, Form 1120. The use of inventories is a key feature of the accrual method of accounting. Inventories are intended to insure a clear reflection of the year's income by matching sales during the taxable year with the purchase costs attributable to those sales; costs attributable to inventory remaining on hand at the end of the year are

---

[12]The Commissioner issued Rev. Rul. 81–298, 1981–2 C.B. 114, in response to his investigation of Molsen & Co.'s method of accounting for its on-call purchase contracts.

not expensed in the year incurred, but are, in effect, deferred until the year in which such inventory is sold. See *Photo-Sonics, Inc. v. Commissioner*, 357 F.2d 656, 657–658 (9th Cir. 1966), affg. 42 T.C. 926 (1964); *All-Steel Equipment Inc. v. Commissioner*, 54 T.C. 1749, 1751 (1970), affd. per curiam on this issue 467 F.2d 1184 (7th Cir. 1972). Where inventories are employed, purchases and sales must be computed on the accrual method (unless another method is authorized by the Commissioner) in order to avoid the distortion of income. Sec. 1.446–1(c)(2), Income Tax Regs.; *Stoller v. United States*, 162 Ct. Cl. 839, 845, 320 F.2d 340, 343 (1963).

Inventories are most commonly valued at either (1) cost or (2) the lower of cost or market. Sec. 1.471–2(c), Income Tax Regs. Use of the latter method accelerates the recognition of unrealized losses on the inventory: where the market value of the inventory on hand at yearend has fallen below its original cost, the decline is recognized as a loss for income tax purposes even though the inventory has not been sold during the year. *St. James Sugar Co-op, Inc. v. United States, supra* at 1226; *D. Loveman & Son Export Corp. v. Commissioner*, 34 T.C. 776, 798 (1960), affd. 296 F.2d 732 (6th Cir. 1961). The lower of cost or market method, expressly approved by the regulations, is a recognized exception to the principle of annual accounting that only closed transactions occurring during the taxable year may be reflected on the year's tax return. *St. James Sugar Co-op, Inc. v. United States, supra.*

Molsen & Co.'s method of valuing ending inventory at market, whether higher or lower than cost, results in the recognition of unrealized gains as well as unrealized losses on the inventory. Valuation at market is the longstanding practice of cotton merchants. Expressly authorized for dealers in securities by section 1.471–5 of the regulations, such method was originally approved for cotton merchants and other dealers in commodities in S.M. 5693, *supra*, and was reapproved in Rev. Rul. 74–227, *supra*. The method was approved on the basis of a brief submitted on behalf of cotton merchants and made a part of A.R.M. 135, 5 C.B. 67, 69 (1921), wherein it was explained:

The bales bought by the cotton merchant from day to day at different prices during the course of a season consist of every known grade of cotton. * * * The identity of the individual bale is not retained, and the cost of the

individual bale is not kept by the cotton merchant and can not be, owing to concentration of all cotton bought and continued additions and shipments from the whole lot, but the value of the cotton on hand can always be determined because of the market quotations and the fact that the commodity is liquid and immediately convertible into cash.

At the close of the year, either fiscal or calendar, the cotton merchant takes an inventory of the cotton on hand. This cotton consists of bales purchased from the first day of the season to the last and represents a wide difference in price paid. The universal practice has been to inventory at market, because that tells the real value of his commodity; further, because the identity of the bale and the matter of cost can not be determined, hence it is impossible to take it other than at the market price.

The Commissioner therefore recognized that valuation of cotton inventory at market conforms to the industry-wide practice of many years and to the best accounting practice in the trade and is the only practical method of arriving at a true and correct reflection of the cotton merchant's income. Rev. Rul. 74–227, *supra*; S.M. 5693, *supra*.

By bringing its unfixed, delivered, on-call purchase contracts to market at the end of its taxable year, Molsen & Co. reduces the size of the gain or loss recognized as a result of its inventory valuation method. The spot (market) price and the futures price of cotton tend to move in tandem. Thus, in a rising market, as the market value of the inventory increases, Molsen & Co.'s potential liability under its unfixed, on-call purchase contracts increases. The accrual to purchases of such liability increases the cost of goods sold and thereby reduces the gross income of the company. In a falling market, Molsen & Co.'s potential liability under its unfixed, on-call contracts declines as the market value of the cotton inventory declines. If the market price were to fall below the amount which Molsen & Co. advanced as a provisional payment under its unfixed, on-call purchases, the amount potentially receivable by the company from the sellers (assuming, as under most of the Memphis territory contracts, that the provisional payment was not a guaranteed minimum price) would be offset against the loss recognized on the inventory. At the end of 1977, the market and futures prices of cotton were rising, and Molsen & Co. accrued $1,099,464.58 to the cost of purchases as the amount that it would have owed on December 31 had the sellers under the Memphis territory and Texas contracts, which were unfixed, called their prices on that day. As it

turned out, the market continued to rise, and Molsen & Co. eventually paid about $1,839,633.70 in 1978 in final settlement of the contracts.

The Commissioner contends that purchases are an expense subject to the "all events" test of sections 1.446–1(c)(1)(ii) and 1.461–1(a)(2) of the regulations, which govern the timing of deductions under the accrual method. Applying such test to the unfixed, delivered, on-call purchase contracts involved here, the Commissioner argues that the provisional payments advanced in 1977 are includable in purchases but that no yearend accrual may be made for the estimated additional amounts due under the contracts because Molsen & Co.'s liability for such additional amounts was contingent until the time that the sellers actually called the price. The petitioners, on the other hand, contend that the Commissioner acted arbitrarily and abused his discretion in disallowing the year-end accrual for the unfixed, on-call purchases because such accrual conformed to industry-wide practice and to generally accepted accounting principles, was consistently applied year after year, and, most importantly, was necessary in order to clearly reflect the company's income. The petitioners present a variety of arguments, but their basic position is that the Commissioner, having recognized the need of cotton merchants for, and the practice of, valuing ending inventory at market, was arbitrary in rejecting their companion practice of bringing unfixed, delivered, on-call purchases to market; to value their inventories at market in any event and to deny them the opportunity to bring their purchase costs to market results, they maintain, in a substantial distortion of income.

As stated above, if a taxpayer uses inventories, purchases must be accounted for under the accrual method in order to accurately reflect the cost of goods sold during the year. Sec. 1.446–1(c)(2), Income Tax Regs. The all events test relied upon by the Commissioner has long been a cornerstone of the accrual method of accounting for Federal income tax purposes. See, e.g., *Brown v. Helvering*, 291 U.S. 193 (1934); *Lucas v. American Code Co.*, 280 U.S. 445 (1930); *United States v. Anderson*, 269 U.S. 422 (1926). The regulations describe the accrual method as follows:

Generally, under an accrual method, income is to be included for the taxable year when all the events have occurred which fix the right to receive such

income and the amount thereof can be determined with reasonable accuracy. Under such a method, deductions are allowable for the taxable year in which all the events have occurred which establish the fact of the liability giving rise to such deduction and the amount thereof can be determined with reasonable accuracy. * * * [Sec. 1.446–1(c)(1)(ii), Income Tax Regs.]

This description of the accrual method is repeated in the regulations under section 451, insofar as it pertains to the accrual of income, and in the regulations under section 461, insofar as it pertains to the accrual of deductible expenses.

In our view, the Commissioner's reliance, in part, on section 1.461–1(a)(2) of the regulations is misplaced. Although purchases are an "expense" in the colloquial sense, it is well settled that they are not a "deduction" within the meaning of section 461 and that they are not subject to the rules governing deductions under such section. Purchases are taken into account in computing the cost of goods sold, which is an offset, or exclusion, employed in the computation of gross profit and gross income (section 1.61–3(a), Income Tax Regs.); whereas, throughout the Code, the term "deduction" is used to refer to amounts subtracted from gross income to arrive at taxable income. *Curtis Gallery & Library, Inc. v. United States*, 388 F.2d 358, 361 (9th Cir. 1967); *B.C. Cook & Sons, Inc. v. Commissioner*, 65 T.C. 422, 428–432 (1975), affd. per curiam 584 F.2d 53 (5th Cir. 1978), and cases cited therein; *National Home Products, Inc. v. Commissioner*, 71 T.C. 501 (1979).

Such distinction was recognized in *Max Sobel Wholesale Liquors v. Commissioner*, 69 T.C. 477 (1977), affd. 630 F.2d 670 (9th Cir. 1980). In that case, the taxpayer, in violation of State law, made sales of liquor and wine to selected customers at posted prices with the understanding that such customers would receive a credit to be used for future purchases or an additional bottle of each case purchased. As the additional bottles were delivered, their cost was charged to the cost of goods sold. Section 162(c)(2) disallows a deduction for an "illegal bribe, illegal kickback, or other illegal payment" otherwise deductible under section 162(a). However, we held that such limitation was not applicable because the cost of the additional bottles was a part of the cost of goods sold. 69 T.C at 484–486. See also *Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707 (1956). Similarly, in *National Home Products, Inc. v. Commissioner*, *supra*, we determined that casualty losses of

inventories are not deductions subject to the "reasonable prospect of recovery test" contained in section 1.165–1(d)(2)(i) of the regulations, which determines the year of deductibility of casualty losses under section 165. The Commissioner had argued that it would be inconsistent to allow inventory losses to be reflected in the cost of goods sold for a year at the end of which there was a reasonable prospect of recovery of such losses while other losses would be disallowed under similar circumstances. We disagreed, stating that "This is simply recognition of the fact that use of inventories in computing gross income for both book and tax purposes is unique and warrants use of different rules to correctly reflect income."[13] 71 T.C. at 530.

The Commissioner has, in his regulations, also recognized that in some industries, the all events test is not to be applied in determining the costs of inventories. For example, section 1.471–6, Income Tax Regs., permits livestock raisers and farmers to value livestock inventory under the "unit-livestock-price method." Such method permits the livestock raiser to estimate the cost of the animals in inventory through a classification system based on the age and kind of the animal "so that the unit prices assigned to the several classes will reasonably account for the normal costs incurred in producing the animals within such classes." Sec. 1.471–6(e), Income Tax Regs. Once established, the unit prices and classifications selected by the livestock breeder must be consistently applied in all subsequent taxable years in the valuation of the livestock inventories. Sec. 1.471–6(f), Income Tax Regs. We have recognized that use of the unit-livestock-price method "is at best an approximation," but that it serves "a useful purpose in that it greatly eases the bookkeeping burden on many taxpayers without an inordinate sacrifice in accuracy." *Auburn Packing Co. v. Commissioner*, 60 T.C. at 801.

---

[13]In *ABKCO Industries, Inc. v. Commissioner*, 56 T.C. 1083 (1971), affd. 482 F.2d 150 (3d Cir. 1973), we applied sec. 461 and the regulations thereunder to bar the taxpayer's accrual of a contingent liability for royalties as a cost of inventory. However, in that case, we did not explicitly address the issue of whether sec. 461 is applicable to an inventoriable cost; apparently, the application of such section was presumed by both parties to the case. *ABKCO* is distinguishable from the present case for two reasons: First, the taxpayer's liability for the royalties which it sought to accrue and the amount thereof were much more speculative than the accruals of Molsen & Co.; and second, there is no evidence that the taxpayer in *ABKCO* valued its ending inventory at market.

Similarly, section 1.471–8 of the regulations permits retail merchants to employ the "retail method" of inventory accounting. Under the retail method, the retail value of the inventory on hand at the close of the year is reduced by a mark-on percentage to arrive at the approximate cost of such inventory. The mark-on percentage (which is an average computed in accordance with the regulations) reflects the amount added to cost to cover selling and other expenses and profit margin. Sec. 1.471–8(a), Income Tax Regs. Although the cost assigned to any particular inventory under the retail method is merely an approximation, it is an accepted and popular method because it is simpler than other methods, particularly for the larger retailer. See R. Hoffman & H. Gunders, Inventories 325–326 (2d ed. 1970).

Both the unit-livestock-price method and the retail method are sanctioned because the practical accounting problems encountered by those in the livestock raising and retail industries have been recognized. Both methods entail some degree of estimation which will ultimately affect the computation of cost of goods sold and, thus, income. However, if consistently applied, such methods result in a clear reflection of income.

Here, the unique accounting needs and practices of the cotton merchants have similarly led to a deviation from the general rules governing the valuation of inventories and the calculation of income. The Commissioner has made no attempt to show how such practices fail to clearly reflect Molsen & Co.'s income. Of course, the recognition of Molsen & Co.'s liabilities for its unfixed, on-call purchases involves some degree of approximation, but the degree of such approximation and the contingency of the liabilities are no greater than the degree of approximation and the contingency attached to the recognition of unrealized income because of the inventory's increased value.

The facts of this case present a persuasive example of why the all events test should not always be applied in determining the costs of inventory. Generally, income is not taxable until it is realized, and it is not realized until it has been received and the offsetting expenses have been paid or incurred. However, the practice of valuing the inventories of a cotton merchant at market can result in the taxation of unrealized income. For

example, if a merchant purchases a pound of cotton for a fixed price of 45 cents, and if that cotton is in his inventory at the end of the year and has a value of 50 cents at that time, he is taxable on 5 cents of unrealized income. In that situation, although the income is unrealized, the merchant does actually stand to make a gain, but if he purchased such cotton under an on-call contract and advanced 45 cents as a provisional payment, he does not, in fact, stand to make such gain. It is utterly unrealistic to treat his cost as merely the 45 cents; if the law recognizes that the cotton has a value of 50 cents, the law must also recognize that its cost is more than 45 cents. Since the value of the inventory is not based upon actual cost, but reflects the market value of the products, it would be paradoxical to apply the all events test and require the merchant to compute the cost of his inventory on the basis of his actual expenditures. The observations of Judge Opper in *Pacific Grape Products Co. v. Commissioner*, 17 T.C. 1097, 1110 (1952) (Opper, J., dissenting), revd. 219 F.2d 862 (9th Cir. 1955), are particularly apposite here:

The practice of disapproving consistent accounting systems of long standing seems to me to be exceeding all reasonable bounds. * * * Methods of keeping records do not spring in glittering perfection from some unchangeable natural law but are devised to aid business men in maintaining sometimes intricate accounts. If reasonably adapted to that use they should not be condemned for some abstruse legal reason, but only when they fail to reflect income. * * *

The Commissioner relies heavily on the Supreme Court's decision in *Thor Power Tool Co. v. Commissioner, supra*, giving him broad authority to determine the accounting methods to be used by taxpayers, but the facts of that case were significantly different. There, the taxpayer sought to writedown its "excess" inventory to what it estimated to be its net realizable value, even though the taxpayer continued to hold such inventory for sale at original prices. The Court determined that because the taxpayer provided no objective evidence of the reduced value of the excess inventory, the writedown was plainly inconsistent with the regulations, and the Commissioner properly disallowed it. 439 U.S. at 538. The Court considered that the taxpayer was, in effect, claiming a loss which it had not sustained, because the inventory was still available and had not been discarded. 439 U.S. at 545. Here, the

Commissioner is attempting to tax Molsen & Co. on income that it has not received. The Commissioner would recognize the increase in the value of the inventory, but he refuses to recognize the increase in the company's liabilities. In *Thor*, the Supreme Court found that there was a distortion in income when the taxpayer attempted to claim a loss not sustained; here, there would be a distortion of income if we adopted the Commissioner's position and taxed Molsen & Co. on income computed without taking into consideration the costs attributable to it.

In the final analysis, whether Molsen & Co.'s method of accounting for its unfixed, delivered, on-call purchases clearly reflects income is a question of fact. *St. James Sugar Co-op, Inc. v. United States*, 643 F.2d at 1223; *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 555 (1979), affd. 633 F.2d 512 (7th Cir. 1980). Based on the facts here present, we conclude that Molsen & Co.'s method clearly reflects its income and that the Commissioner was arbitrary and abused his discretion in seeking to change it.

The petitioners' position is strengthened by the following facts: (1) That Molsen & Co. used its method of accounting consistently in each of the years of its existence (see *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. at 556; *Auburn Packing Co. v. Commissioner*, 60 T.C. at 799; *Sam W. Emerson Co. v. Commissioner*, 37 T.C. 1063, 1068 (1962)); (2) that its method conforms to an industry-wide practice of very long standing (see sec. 1.446–1(a)(2), Income Tax Regs.; *Garth v. Commissioner*, 56 T.C. at 619); and (3) that its method conforms to the best accounting practice in the industry (see *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 14–15 (1974), but see *Thor Power Tool Co. v. Commissioner, supra*). In addition, although Molsen & Co.'s accrual to purchases may not have met the all events test, on December 31, 1977, it was more than likely that the liabilities would become definitely fixed within a matter of months and that the liabilities would approximate the amount of the accrual. The market and the futures prices of cotton had risen by the end of the year, and while the market and the response thereto of the cotton sellers could not be predicted with complete accuracy, it was reasonable to assume that, in the event of a subsequent decline in the

market, most of the sellers would call their contracts before their prices declined to the level of their provisional payments.

Moreover, the Commissioner's proposed treatment of unfixed, delivered, on-call purchases is inconsistent with his treatment of hedging transactions entered into by cotton merchants. A cotton merchant may hedge fixed price purchases and fixed price sales by entering into offsetting positions in the futures market. Hedging reduces the merchant's risk in the event of fluctuations in the market price of cotton. Hedging almost always involves taking a straddle position. As a result, the cotton merchant will normally make money on the actual cotton and lose money on the futures, or profit on the futures and lose (or receive less profit) on the actual cotton. See generally Willingham, "More than You Ever Wanted to Know About Hedging," 3 Agricultural L. J. 100–114 (1981–82). Gains and losses on hedging transactions receive ordinary income (or loss) treatment. See *Stewart Silk Corp. v. Commissioner*, 9 T.C. 174 (1947), and cases cited therein.

Since 1921, the Commissioner has expressly permitted cotton merchants, in determining gross income, to take into account gains and losses at the end of the taxable year based upon the market value of the open futures contracts to which they are parties as hedges against actual spot or cash transactions. A.R.M. 135, 5 C.B. 67 (1921), which is updated, restated, and superseded by Rev. Rul. 74–223, 1974–1 C.B. 23. The practice of bringing open futures contracts that are hedges to market at yearend is a part of the cotton merchants' larger accounting practice of bringing all elements of income to market at yearend:

In the keeping of books in the cotton business, it has been the custom, existing over a period of approximately 100 years, for the cotton merchants to take into consideration at market his forward sales, purchases, and hedges, and if they show a profit, that is added to the season's business. If on the other hand, they show a loss, it is deducted from the season's business. His real profit, or loss, is hereby determined for the year. This system of bookkeeping is the only accurate and correct system that has been devised that truly reflects the net profit or loss of any given year's business, either fiscal or calendar. * * * [Rev. Rul. 74–223, *supra*, 1974–1 C.B. at 24.]

In permitting cotton merchants to bring their hedges to market at the end of the year, the Commissioner acknowl-

edged that such practice was an exception to the "closed transaction" doctrine. A.R.M. 135, *supra*, 5 C.B. at 67.

In our opinion, an on-call purchase contract appears to function in much the same way as a hedge. For example, assume that a cotton merchant purchases 100 bales of cotton at a fixed price of 50 cents per pound, and at the same time, hedges the purchase by entering into a futures contract to deliver 100 bales of cotton at 55 cents per pound at a specified future date, for a combined theoretical profit of 5 cents on the actual and the futures transactions. In the event of a rise in the cotton market, the merchant's profit on the sale of the cotton will normally be offset by a loss on the closeout of the futures transaction. (Assuming that the market and futures prices move exactly in tandem, the merchant's 5 cents per pound profit is preserved.) In the event of a fall in the market, the loss on the sale of the cotton will be offset by the gain on the futures. An on-call purchase contract works in an analogous fashion. A rise in the market causes the company to recognize a profit on the sale of the cotton or an unrealized gain on the valuation of the cotton if it remains in inventory, but such profit or gain is offset in part by the accompanying increased liability for purchase cost under the on-call contract. Conversely, in a falling market, assuming that the provisional payment is not a guaranteed minimum price, the loss on the sale or inventory valuation of the cotton is offset by the company's reduced liability for purchase cost. We can perceive of no good reason why the Commissioner should allow cotton merchants to bring their hedging transactions to market at yearend and yet refuse to permit those same merchants to bring their unfixed, delivered, on-call purchases to market at yearend. Both practices are obviously a part of the cotton merchants' larger practice "of bringing all elements to market price at the end of the taxable year, which has been in use for a long period of years and which conforms to the best accounting practices in the trade, [and] is recognized as the only practical method of arriving at a true and correct result of the operations." Rev. Rul. 74–223, *supra*, 1974–1 C.B. at 24; see Rev. Rul. 74–227, 1974–1 C.B. at 121.

The petitioners also point out that the Commissioner's proposed treatment of on-call purchases is inconsistent with the cotton merchants' practice of bringing unfixed, delivered,

on-call sales to market at the end of the year.[14] The Commissioner has taken no position with respect to such practice, but it is clearly another facet of the cotton merchants' general practice of bringing all open transactions to market. Some cotton merchants testified to their understandable concern that the Commissioner's approach to on-call purchases will distort the merchants' income if on-call sales are still to be brought to market: as the futures price of cotton changes, the merchants' on-call sales revenues increase or decrease inversely to the increase or decrease in the merchants' liabilities for on-call purchases; thus, if only on-call sales are brought to market, income will be overstated in a rising market and understated in a falling market. This is but another example of how the Commissioner's proposed change in the merchants' long-standing practice of accounting for on-call purchases will result in a distortion of their income. By altering a single aspect of the merchants' overall method of accounting for income, the Commissioner would change a method that clearly reflects income to one that does not.

Finally, the Commissioner has suggested that Molsen & Co.'s need to make a yearend accrual for unfixed, delivered, on-call purchases would not have arisen had the company adopted a taxable year based on its fiscal year and the cotton season. It is true that many cotton merchants usually have no delivered, on-call purchases remaining unfixed at the close of their taxable years because they have adopted years ending nearer the end of the cotton season on July 31. However, some cotton merchants testified that on-call purchases are occasionally based on October futures and that, consequently, it is possible for such purchases to be unfixed on July 31. Furthermore, there is absolutely no evidence that Molsen & Co. is attempting to manipulate its tax liability by employing a taxable year based on the calendar year. The company has employed its December 31 tax year since its founding as a partnership over 50 years ago. Conceivably, a calendar year was adopted to conform to the taxable years of the partners of the closely held business.

---

[14]Although Molsen & Co. rarely has unfixed, delivered, on-call sales at the close of its taxable year (because the company, as a rule, requires its buyers to call the price before it will deliver the cotton), several other cotton merchants testified that their firms have delivered, on-call sales remaining unfixed at yearend that are brought to market for tax purposes.

The second issue for decision is whether the petitioners are entitled to an award of costs and attorneys' fees. This Court is without authority to award costs or attorneys' fees unless specifically authorized to do so by act of Congress. See *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975); *Sharon v. Commissioner*, 66 T.C. 515 (1976), affd. 591 F.2d 1273 (9th Cir. 1978). The petitioners contend that they are entitled to costs and attorneys' fees pursuant to 28 U.S.C. section 2412 (1982 ed.), as amended by the Equal Access to Justice Act, Pub. L. 96–481, title II, sec. 204(a), 94 Stat. 2327 (effective Oct. 1, 1981).[15]

By virtue of 28 U.S.C. section 451 (1981 ed.),[16] section 2412 of tit. 28 applies only to courts established under article III of the United States Constitution, that is, courts "the judges of which are entitled to hold office during good behavior." *McQuiston v. Commissioner*, 78 T.C. 807, 811 (1982), affd. without published opinion 711 F.2d 1064 (9th Cir. 1983); *Sharon v. Commissioner*,

---

[15]Sec. 2412 of tit. 28, as in effect when the petitioners commenced these cases, provided in pertinent part as follows:

Sec. 2412. Costs and Fees

(a) Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency and any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. A judgment for costs when taxed against the United States shall, in an amount established by statute, court rule, or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by such party in the litigation.

(b) Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States or any agency and any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

\*       \*       \*       \*       \*       \*       \*

(d)(1)(A) Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

[16]Sec. 451 of tit. 28 provides in pertinent part as follows:

Sec. 451. Definitions

As used in this title:

The term "court of the United States" includes the Supreme Court of the United States, courts of appeals, district courts constituted by chapter 5 of this title, including the Court of Claims, the Court of Customs and Patent Appeals, Court of International Trade and any court created by Act of Congress the judges of which are entitled to hold office during good behavior.

66 T.C. at 534. It does not apply to the Tax Court, an article I court, whose judges serve for a term of 15 years after taking office. Secs. 7441, 7443(e); *Bowen v. Commissioner*, 706 F.2d 1087 (11th Cir. 1983), affg. per curiam 78 T.C. 55 (1982); *McQuiston v. Commissioner*, 78 T.C. at 811. Therefore, we have no authority to grant costs or attorneys' fees to the petitioners under section 2412 of title 28. We observe that taxpayers prevailing in the Tax Court may now recover reasonable litigation costs, including attorneys' fees, pursuant to section 7430 of the Code,[17] but such section is only applicable to proceedings commenced after February 28, 1983, and before January 1, 1986. Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, sec. 292(a), (e), 96 Stat. 572, 574 (1982). A case is commenced in this Court by the filing of a petition. Rule 20(a), Tax Court Rules of Practice and Procedure. Since the petitioners filed their petitions in these cases on September 10, 1982, we are unable to award them costs or attorneys' fees under section 7430.

*Decisions will be entered for the petitioners.*

---

[17]Sec. 7430 provides in pertinent part as follows:

SEC. 7430(a). IN GENERAL.—In the case of any civil proceeding which is—
   (1) brought by or against the United States in connection with the determination, collection, or refund of any tax, interest, or penalty under this title, and
   (2) brought in a court of the United States (including the Tax Court and the United States Claims Court),
the prevailing party may be awarded a judgment for reasonable litigation costs incurred in such proceeding.