T.C. Memo. 1996-313


UNITED STATES TAX COURT


RICHARD K. AND CHRISTINE M. MCGIRL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11510-94.                    Filed July 11, 1996.


<u>Mark A. Pridgeon</u>, for petitioners.

<u>Jonathan P. Decatorsmith</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined the following
deficiencies in and penalties on petitioners' Federal income
taxes:

|  |  | Accuracy-related penalties | Penalty |
| Year | Deficiency | Sec. 6662(a) | Sec. 6663 |
| 1989 | $13,501 | --- | $10,126 |
| 1990 | 25,904 | $30 | 19,316 |
| 1991 | 21,334 | 51 | 15,809 |

As an alternative to the section 6663 fraud penalty, respondent
determined additional accuracy-related penalties pursuant to

section 6662(a) in the respective amounts of $2,700, $5,181, and $4,267 for 1989, 1990, and 1991. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. After concessions,[1] the issues for decision are:

(1) Whether petitioners overstated the Yogurt Station, Inc.'s, (Yogurt Station)[2] automobile mileage deductions for 1989, 1990, and 1991;

(2) whether petitioners understated the Yogurt Station's gross income for 1989, 1990, and 1991, as determined by respondent;

(3) whether petitioners understated the Yogurt Station's deductions for 1989, 1990, and 1991;

(4) whether petitioners are liable for accuracy-related penalties under section 6662(a) with respect to the underpayments of tax resulting from their failure to report dividend income of $26, $992, and $1,726 for the years 1989, 1990, and 1991, respectively; and

(5) whether petitioners are liable for penalties for fraud pursuant to section 6663 for 1989, 1990, and 1991; or in the

---

[1] Petitioners have conceded that they received, but did not report on their individual Federal income tax returns, taxable dividend income in the amounts of $26, $992, and $1,726 for the years 1989, 1990, and 1991, respectively.

[2] The Yogurt Station's business activity was reported on Form 1120S, U.S. Income Tax Return for an S Corporation. The record does not establish whether the Yogurt Station was a validly formed corporation. However, since the Yogurt Station was wholly owned by petitioner Richard McGirl, this void in the record does not affect our decision.

alternative, whether petitioners are liable for the accuracy-related penalty under section 6662(a).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Background

Petitioners, Richard K. McGirl (Mr. McGirl) and Christine M. McGirl (Mrs. McGirl), were married to each other at all relevant times and resided in St. Paul, Minnesota, at the time they filed their petition.

Mrs. McGirl graduated from high school but did not attend college. She did not take any accounting or bookkeeping courses in high school. Before she worked at Mickey's Diner and the Yogurt Station, both described below, Mrs. McGirl worked as a receptionist at a doctor's office, as a secretary at various places, and as a cashier at a grocery store.

Mr. McGirl graduated from the University of Minnesota with a bachelor of science degree in American history and industrial relations. He did not take any accounting or bookkeeping courses in college or high school. Before operating Mickey's Diner and the Yogurt Station, he worked in a warehouse and as a production foreman trainee in a foundry.

Mickey's Diner

Mr. McGirl bought Mickey's Diner, a 24-hour diner, before he started the Yogurt Station. Mrs. McGirl worked at Mickey's

Diner, and as part of her duties, she prepared the employees' payroll records, issued paychecks, and prepared quarterly payroll tax reports.

The Yogurt Station

The Yogurt Station was formed in 1985; it was wholly owned by Mr. McGirl during the years in issue. Petitioners were involved with the Yogurt Station since its inception. Income and expenses were reported for Federal income tax purposes on Forms 1120S.

The Yogurt Station was in the business of operating a fast food retail store that was located in a shopping mall known as Bandana Square in St. Paul, Minnesota. It sold yogurt products, sandwiches, salads, and beverages. The storage space available to the Yogurt Station was inadequate for the business. Petitioners often drove to pick up food and supplies that vendors would not deliver. The Yogurt Station employed several individuals to provide services on a part-time basis for compensation.

Mrs. McGirl worked full time at the Yogurt Station and was responsible for depositing its receipts to the business bank account and for writing checks to suppliers and employees. She was also primarily responsible for tallying the Yogurt Station's daily receipts. Mrs. McGirl maintained a notebook in which she recorded the daily sales figures. She provided the daily sales figures to Mr. McGirl.

Mr. McGirl also worked at the Yogurt Station and was

responsible for performing financial and bookkeeping duties. He also wrote checks to suppliers. Mr. McGirl was responsible for providing information to the Yogurt Station's accountant so that he could prepare the corporate income and sales tax returns.

Petitioners used a cash register at the Yogurt Station that recorded sales on a paper tape. Mrs. McGirl used the cash register tape to tally gross sales on a daily basis. The cash register had a functioning "X" key that tallied daily sales when punched. Petitioners received invoices in connection with many of their purchases; they recorded the particular invoice numbers on many of the checks used to pay for the purchases. Petitioners did not prepare, maintain, or have a professional prepare any accounting ledgers, spreadsheets, or similar items in connection with operating the Yogurt Station.

During the years at issue, the Yogurt Station maintained a checking account (the business checking account) at Cherokee State Bank in St. Paul, Minnesota. Some of the checks written on the business checking account during the years at issue were for personal expenditures. The total deposits to the business checking account for the years 1989, 1990, and 1991 were $126,464.21, $146,054.76, and $153,080.77, respectively. The parties agree that, with the exception of certain amounts claimed by petitioners to be loan proceeds, the total deposits to the business checking account for the years at issue are gross receipts of the Yogurt Station.

<u>Corporate Tax Returns</u>

The Yogurt Station reported the following gross receipts, cost of goods sold, and expenses on its Federal corporate income

tax returns for the years in issue:

|  | 1989 | 1990 | 1991 |
|---|---|---|---|
| Gross receipts | $70,154 | $54,681 | $65,582 |
| **Cost of goods sold** |  |  |  |
| Purchases/food supplies | $21,046 | $13,670 | $11,640 |
| Cost of labor | 5,886 | 19,534 | 20,000 |
| Total | 26,932 | 33,204 | 31,640 |
| **Expenses** |  |  |  |
| Officer compensation | $13,925 | $6,000 | $6,000 |
| Rent | 2,806 | 4,800 | 1,250 |
| Taxes | 8,478 | 9,755 | 9,163 |
| Interest | 90 | --- | --- |
| Depreciation | 9,749 | 8,307 | 9,319 |
| Legal | 1,500 | 2,000 | 1,100 |
| Accounting | 600 | 1,000 | 800 |
| Vehicle expense | 3,825 | 3,900 | 4,125 |
| Maintenance | 150 | 500 | 1,276 |
| Equipment | 125 | 1,000 | 700 |
| Miscellaneous | 75 | 350 | 450 |
| Phone | --- | 1,000 | 800 |
| Bank charges | --- | --- | 75 |
| Subscriptions | --- | --- | 110 |
| Insurance | --- | --- | 980 |
| Total | 41,323 | 38,612 | 36,148 |
| Ordinary income (loss) | 1,899 | (17,135) | (2,206) |

Clarence F. Lauth, a relative of Mrs. McGirl, prepared the corporate tax returns for the years 1987 through 1991 for compensation. Mr. McGirl provided the information used by Mr. Lauth to prepare the corporate tax returns. This information was in the form of a single sheet of paper containing summary figures of income and expenses (the summary sheet) and a payroll summary; no breakdown showing how the figures were computed was provided to Mr. Lauth. Although he told Mr. Lauth that his figures were accurate, Mr. McGirl simply wrote numbers on the summary sheet

without making any attempt to calculate the correct amount or verify their accuracy. The corporate tax returns for the years 1989 and 1991 were signed by Mr. McGirl. The record does not reflect who signed the 1990 corporate tax return. The corporate tax returns made no reference to any business activity other than the Yogurt Station for all of the years in issue.

Petitioners' Joint Federal Income Tax Returns

Mr. Lauth prepared each of petitioners' joint Federal income tax returns (joint tax returns) for the years 1989 through 1991. The information reflected on these joint tax returns was provided to Mr. Lauth by Mr. McGirl in the form of a single sheet of paper setting forth total income and deduction figures. Petitioners reported the following items of income, adjustments to income, itemized or standard deductions, and deductions for exemptions on their joint tax returns for the years in issue:

|  | 1989 | 1990 | 1991 |
|---|---|---|---|
| Yogurt Station wages | $13,925 | $19,800 | $20,800 |
| Taxable interest income | 163 | --- | 328 |
| Dividend income | 2,348 | 2,911 | 2,550 |
| Capital gain (loss) | (286) | --- | 8,645 |
| Other income | --- | 21,500 | --- |
| Yogurt Station income (loss) | 1,899 | (17,135) | (2,206) |
| Total income | 18,049 | 27,076 | 30,117 |
| Adjustments to income | 4,000 | 4,750 | 5,063 |
| Adjusted gross income | 14,049 | 22,326 | 25,054 |
| Itemized/standard deductions | 6,036 | 5,540 | 5,700 |
| Exemptions | 4,000 | 4,100 | 4,300 |
| Taxable income | 4,013 | 12,686 | 15,054 |
| Tax | 604 | 1,916 | 2,261 |

The "Other income" of $21,500 for the year 1990 came from the settlement of a lawsuit.  The joint tax returns made no reference to any business activity other than the Yogurt Station for all of the years in issue.  On August 4, 1992, Mr. McGirl told Mr. Lauth that he had unreported income and that the underreporting "had been going on for some time."  During the years in issue, Mr. McGirl amassed more than $112,000 in savings.

Mr. McAllister's Alleged Loans to Mr. McGirl

It is undisputed that Michael McAllister, a close friend of Mr. McGirl since childhood, lent him $10,000 sometime during the years at issue.[3]  Mr. McGirl issued a $10,000 check to Mr. McAllister on or about July 7, 1992, a date after Mr. McGirl was contacted by the Minnesota Department of Revenue (MDR) regarding a State tax examination of the Yogurt Station.  Mr. McGirl fabricated promissory notes in which he forged Mr. McAllister's signature and gave them to his own accountant, Steve Brown.  Mr. Brown represented Mr. McGirl before the MDR and the Internal Revenue Service (IRS).  Mr. Brown gave the fabricated promissory notes to an MDR agent.

Since 1985 and continuing through the years in issue, Mr. McAllister had significant personal debt, including automobile loans, home mortgages, and credit cards that were utilized to

---

[3]  Mr. McGirl maintains that Mr. McAllister lent him additional sums of money that eventually made their way into the Yogurt Station's business checking account and thus should not be considered gross receipts.

their full extent and which bore interest at annual rates up to 22 percent.

MDR's Audit of the Yogurt Station

Debora Berg, a tax auditor for the MDR, informed Mr. McGirl by letter in May of 1992 that she would be examining the Yogurt Station's State tax liabilities. The letter asked Mr. McGirl to provide Ms. Berg with the Yogurt Station's business and accounting records. Mr. McGirl called Ms. Berg on May 20, 1992, and told her he did not have a business checking account, all of the store's expenses were paid in cash, and he did not keep receipts or documents. When Mr. McGirl first met with Ms. Berg on August 25, 1992, he brought the canceled checks and deposit slips from the business checking account. When questioned about his earlier statement that the Yogurt Station did not have a checking account or records and that all expenses were paid by cash, Mr. McGirl told Ms. Berg that he thought she would drop the audit if he dealt solely in cash. Mr. McGirl admitted to Ms. Berg that the numbers on the Yogurt Station's State tax returns were just guesses. After inputting the checks and deposits onto a computer, Ms. Berg discovered that the Yogurt Station's deposits exceeded the amounts reported on its State tax returns. Ms. Berg contacted Hubbard Burgess, an IRS representative, and informed him that she believed the Yogurt Station had unreported income.[4] Seven former Yogurt Station employees provided

---

[4] It was customary for MDR to work jointly with the IRS.

affidavits to the MDR that stated that the cash register worked properly.

## The IRS Audit

Mr. Burgess met with Mr. McGirl and Ms. Berg on November 23, 1992.  Mr. McGirl, for the first time, stated that he had borrowed money from a friend, Mr. McAllister.  Mr. McGirl did not state the amount of the alleged loans or produce any documentation to support their existence at this meeting.  Mr. McGirl also mentioned for the first time that he was involved with another business; i.e., the purchase and sale of used restaurant equipment.  Mr. McGirl never produced the cash register tapes, invoices, copies of store leases, automobile logs, or the pieces of paper given to him by Mrs. McGirl on which she tallied the daily sales.  Other than canceled checks and invoices submitted in connection with legal expenses, Mr. McGirl failed to present any supporting documentation to substantiate the Yogurt Station's expenses.

## Petitioners' Check Spreads

Although petitioners did not maintain a cash disbursement journal in the regular course of their business, they did prepare check spreads prior to trial, in anticipation of this case. There is a separate check spread for each year in issue.  Each check spread lists the number, date, payee, and amount for each of the business checks.  The checks are "spread" across the page

into specific expense categories.  The yearly totals, by expense category, are as follows:

|              | 1989   | 1990   | 1991   |
|--------------|-------:|-------:|-------:|
| Auto         | $939   | $1,372 | $2,011 |
| Auction      | 370    | 2,460  | 2,650  |
| Food         | 33,114 | 38,397 | 33,870 |
| Equipment    | 2,794  | 6,435  | 635    |
| Misc.        | 9,406  | 7,142  | 7,670  |
| Personal     | 1,162  | 647    | 4,685  |
| Professional | 2,240  | 4,042  | 1,200  |
| Repair       | 5,089  | 3,075  | 2,059  |
| Supplies     | 2,721  | 2,011  | 2,118  |
| Taxes        | 6,618  | 10,437 | 9,006  |
| Wages        | 26,073 | 24,943 | 26,111 |
| Mike's Loan  | 32,185 | 42,165 | 38,416 |
| Other        | 36     | 6,799  | 11,774 |

The "Misc." category includes rent, insurance, and telephone. The "Other" category includes missing checks not returned with the bank statement, checks that petitioners could not identify, loans, including a $5,000 loan in 1990, and a $10,020 check to Cherokee State Bank in 1991 for an unknown purpose.  The "Mike's Loan" category consists of checks written by Mr. McGirl to First Jersey National Bank that were routed into petitioners' Dean Witter investment accounts.  Of the $26,073 in wages for 1989, $20,861 was paid to petitioners.[5]

Mr. McGirl's Automobile Logs

Mr. McGirl deducted an amount attributable to 15,000 miles of business use of a 1985 Honda on each of the Yogurt Station's

---

[5]  Petitioners only reported $13,925 in wages from the Yogurt Station on their 1989 joint Federal income tax return.

corporate tax returns for the years in question. Although Mr. McGirl produced auto logs at trial, he never presented the logs to any representative of the IRS or the MDR during their respective audits.

The original auto logs are composed of 8-½ by 11 inch sheets of white paper with the following typed headings above four columns: Day/Month, Odometer Reading Start, Odometer Reading End, and Business Purpose. There is a separate page for each month. Each page has rows numbered 1 through 31 (corresponding to the days of the month) on the left side. The beginning and ending mileage columns account for every single mile the automobile was driven during the 3 years; there are no mileage gaps between entries. The auto logs reflect total mileage for 1989, 1990, and 1991 as 13,802, 17,626 and 20,079, respectively. There is an abbreviated business purpose recorded for every entry. Almost all of the entries in the business purpose column are noted as "auction", "supplies", or "food supplies".

The auto logs are remarkably well preserved; they are not folded, creased, or crumpled; there are no marks on the papers that would indicate they were kept on a clipboard. The pages are in pristine condition.

Petitioners' Business Records

Petitioners have thrown away almost every contemporaneous piece of documentary evidence of their business activities, with the exception of the business checking account and allegedly

contemporaneously prepared auto logs.  Petitioners maintained no books or records other than cash register tapes and a calculation of daily sales (both thrown away).

## Mr. McGirl's State Tax Felony Convictions

On March 18, 1994, Mr. McGirl pleaded guilty to count one of the amended complaint filed by the State of Minnesota charging him with making and filing 54 false State sales tax returns, each involving more than $300 in tax, from the period 1988 through June 1992.

### OPINION

Petitioners admit they underreported the gross receipts of the Yogurt Station, but argue that they should be allowed offsetting deductions for expenses which they simultaneously underreported on the Yogurt Station's corporate tax returns.

Petitioners bear the burden of showing that they are entitled to the additional deductions and that respondent's determination of the gross income is incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  Since there is virtually no documentary evidence to support their claims for increased deductions other than canceled checks, petitioners' credibility is crucial in meeting their burden.  We first shall examine Mr. McGirl's auto logs as they are offered in support of the Yogurt Station's automobile expense deductions and are the only allegedly contemporaneous records retained.

1.  Automobile Mileage Deduction

Mr. McGirl claimed deductions on the Yogurt Station's 1989, 1990, and 1991 corporate income tax returns for automobile expenses in the amounts of $3,825, $3,900, and $4,125, respectively. These expenses were apparently computed by multiplying 15,000 annual miles by the prevailing standard mileage rate. We find that the auto logs offered into evidence by Mr. McGirl were not contemporaneously made, as required by section 1.274-5(c)(2)(ii)(a), Income Tax Regs.

Mr. McGirl testified that he only kept track of business miles on his auto logs, yet every mile driven is accounted for. Either Mr. McGirl had no personal use whatsoever of his automobile over a 3-year period or part, if not all, of the auto logs is a fabrication. There is no credible evidence in the record to suggest that Mr. McGirl drove his automobile solely for business purposes. Based upon this implausibility and on the following inconsistencies, we find Mr. McGirl's auto logs to be fabrications. Mr. McGirl never offered the auto logs to the MDR or the IRS when he was examined. The auto logs show annual business mileage of 13,802, 17,626, and 20,079 for the years 1989, 1990, and 1991, respectively. However, the Yogurt Station claimed exactly 15,000 business miles in each of the years in issue. Mr. McGirl never gave the auto logs to Mr. Lauth, his tax return preparer. Mr. McGirl saw no need to keep any business receipts, invoices, books, or records, but maintained that he kept "very accurate records" of the business use of his car. Mr.

McGirl testified that he kept the auto logs underneath the front seat of his automobile, but the individual pages of the logs are in pristine condition, totally inconsistent with that manner of storage. The auto logs indicate Mr. McGirl's lack of credibility. We find that petitioners have not proven that the Yogurt Station is entitled to automobile expense deductions in excess of those allowed by respondent.

2. Unreported Income

Mr. McGirl's explanation of the underreporting of the Yogurt Station's gross receipts revolves around an alleged business activity that was not reported on the Yogurt Station's or petitioners' tax returns and purported loans used to finance the alleged activity.

a. Mr. McGirl's Alleged Restaurant Equipment Business

Mr. McGirl testified that he carried on a business[6] totally apart from the Yogurt Station; i.e., the sale of used restaurant equipment and maintenance of refrigeration equipment. He allegedly bought used restaurant equipment at auctions, sometimes cleaned and fixed it up, and sold the equipment to bars and restaurants. This business had no fixed location; Mr. McGirl supposedly would stop by bars and restaurants and offer to sell them the used equipment or to perform maintenance on their refrigeration equipment. All of the alleged business activity

---

[6] The use of the term "business" is for convenience only and does not imply a finding that any such business existed.

was carried on in cash. No records were kept. Mr. McGirl testified that "an ideal trip for me would go - - would be to leave the Twin Cities empty, if it [the auction] was out of town, and to buy, clean, fix, and sell on the road then come back empty-handed except, of course, with money." Mr. McGirl testified that some of the money would be spent on supplies, meals, motels, and gasoline for the automobile. The money left over was supposedly given to Mrs. McGirl, who deposited it into the business checking account. Mr. McGirl further testified that the business was carried on for all of the years at issue. Mrs. McGirl did not testify concerning this business. Other than the fabricated auto logs and his own self-serving testimony, Mr. McGirl offered no proof of the business' existence.

b. Purported Loans From Mr. McAllister

Mr. McGirl testified that he borrowed[7] a total of $73,500 from Mr. McAllister, a longtime friend. According to a computer-generated summary produced by Mr. McAllister after the start of the MDR audit, Mr. McGirl borrowed money from him 101 times between September 1988 and March 1991. The amounts supposedly borrowed were in either $500 or $1,000 amounts, with two exceptions. Mr. McGirl and Mr. McAllister testified that the loans were always in cash. According to Mr. McGirl, he borrowed money from Mr. McAllister before each "auction" trip because he

---

[7] The use of the words "borrowed" and "loan" are for convenience only and do not reflect a finding that any loans existed.

needed cash to purchase items at auctions.

Mr. McAllister testified that each of the 101 loans was evidenced by a separate IOU. These IOU's supposedly were used by Mr. McAllister to create the computer-generated summary which was offered into evidence. Mr. McAllister testified that he gave the IOU's to Mr. McGirl when the latter signed a consolidated note for $63,500, the amount Mr. McGirl allegedly owed to Mr. McAllister after a $10,000 payment. However, Mr. McAllister told Ms. Berg and Mr. Burgess that he never returned any IOU's to Mr. McGirl. Petitioners did not offer the IOU's into evidence. However, respondent offered into evidence IOU's created by Mr. McGirl which were given to the MDR's criminal investigator, Mr. Erickson, by petitioners' representative at the time, Mr. Brown. At trial, Mr. McGirl admitted that he made up the IOU's and forged Mr. McAllister's signature on them.

The consolidated note for $63,500 was put into evidence. It is a demand note with interest at 10 percent, dated July 7, 1992, with no stated maturity date or payment schedule. The consolidated note has no interest on the amounts advanced since September of 1988.

Mr. McAllister's testimony that he lent Mr. McGirl $73,500 over a 3-year period was vague, incredible, and contradicted in part by his statements to Ms. Berg. The alleged documentation for all 101 loans was missing. No payments were ever made on the loans until a single $10,000 payment was made in July 1992, after

the MDR audit had commenced. Mr. McAllister testified that the loans were all made in cash and were made from a cash hoard of $25,000, checks for cash from his bank accounts, and cash loans he received from an individual Mr. McAllister initially referred to simply as "Red". Mr. McAllister refused to identify who Red was when he spoke with Ms. Berg. At trial, Mr. McAllister denied keeping Red's identity a secret from Ms. Berg. The canceled checks to cash were not offered as evidence. No documentation of any loan from Red was put into evidence, and although Mr. McAllister claims he paid Red's estate[8] back by check, the canceled check also was not offered into evidence. Mrs. McGirl did not testify concerning the alleged loans.

In summary, Mr. McGirl's explanation of the unreported gross receipts is that $32,000, $30,500, and $7,000 for the years 1989, 1990, and 1991, respectively, are amounts lent to him by Mr. McAllister to purchase auction items. Since the cash remaining after an auction trip was allegedly deposited into the business checking account, Mr. McGirl maintains that total deposits overstate income by the amount of the loans.[9] Therefore, Mr.

_____

[8] Red is apparently deceased.

[9] Mr. McGirl testified: "Well, as I mentioned before, an ideal trip would be to come back empty-handed. Unfortunately, you know, I have got a garage full of equipment. I got my basement full of equipment. I have got - - a friend of mine's garage is full of equipment." Even if Mr. McGirl's testimony is believed, he could not deduct the cost of equipment purchased until it was sold. Mr. McGirl testified that he was in the business of selling used restaurant equipment and that he used the loans to
(continued...)

McGirl argues that the understated income should be calculated as follows:

| Year | Total deposits | McAllister loans | Reported deposits | Understated Income |
|------|---------------|------------------|-------------------|--------------------|
| 1989 | $126,464 | $32,000 | $70,154 | $24,310 |
| 1990 | 146,055 | 30,500 | 54,681 | 60,874 |
| 1991 | 153,081 | 7,000 | 65,582 | 80,499 |

c.  Reconstruction of Income

Every individual liable for tax is required to maintain books and records sufficient to establish the amount of his or her gross income.  Sec. 6001; DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  Where a taxpayer fails to maintain or produce adequate books and records, the Commissioner is authorized to compute the taxpayer's taxable income by any method that clearly reflects income.  Sec. 446(b); Holland v. United States, 348 U.S. 121 (1954); Webb v. Commissioner, 394 F.2d 366, 371-372 (5th Cir. 1968), affg. T.C. Memo. 1966-81.  The reconstruction of income need only be reasonable in light of all surrounding facts and circumstances. Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970).  The Commissioner is given latitude in determining which method of reconstruction to apply when a taxpayer fails to maintain

---

[9](...continued)
buy the equipment.  The purchased equipment would be his inventory.  A taxpayer may not deduct inventory purchases. Molsen v. Commissioner, 85 T.C. 485, 502 (1985).  No documentary evidence or testimony was offered by petitioners to establish the cost of the ending inventory for each year in question.

records.  Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989).

For the years under consideration herein, petitioners maintained inadequate books and records for the Yogurt Station. As a result, respondent used the bank deposit method to reconstruct the Yogurt Station's gross income.  "The bank deposit method assumes that all money deposited in a taxpayer's bank account during a given period constitutes taxable income."  DiLeo v. Commissioner, 96 T.C. at 868.  Bank deposits are prima facie evidence of income.  Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977).

Only Mr. McGirl testified at trial about his used restaurant equipment auction and maintenance business.  No records, no bills of sale, no original IOU's, or any other document, with the exception of the fabricated auto logs, were offered to support Mr. McGirl's testimony.  It is up to petitioners to prove a nontaxable source of the deposits.  Petitioners stipulated that, except for loans from Mr. McAllister, all the Yogurt Station's deposits were income.  Viewing the record as a whole, we find it improbable and unconvincing that Mr. McAllister provided the funds as claimed.  We are not required to accept blindly testimony which patently appears to he "highly improbable or manifestly unreasonable."  Carmack v. Commissioner, 183 F.2d 1, 2 (5th Cir. 1950), affg. a Memorandum Opinion of this Court.  Mr. McGirl would have the Court believe that during a period when Mr.

McAllister had automobile loans, home mortgages, and fully utilized his credit cards at interest rates up to 22 percent, he kept a cash hoard of $25,000, lent Mr. McGirl money 101 times at a rate of 10 percent with no fixed payment schedule, and consolidated 3 years of loans after receiving one payment of principal, without adding accrued, yet unpaid interest.  Mr. McGirl would have the Court believe that he borrowed money almost weekly during a period when he amassed more than $112,000 in savings, for an alleged business whose existence he was unable to document by any reliable evidence.  The record as a whole contradicts the testimony of Mr. McGirl and Mr. McAllister; simply put, we do not believe them.

Petitioners have not proven that any purported transfers were loans.  Therefore, they have not met their burden of proof in establishing a nontaxable source for the deposits.[10]

3.  Increased Expenses

Petitioners argue that the Yogurt Station is entitled to offset its unreported gross receipts with additional expenses that were not claimed on its corporate tax returns.  Deductions are a matter of legislative grace; petitioners have the burden of showing that they are entitled to any deduction claimed.  New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  Mr.

---

[10]  Even if we accepted Mr. McGirl's testimony that Mr. McAllister provided him with funds 101 times, which we do not, petitioners would still have to show that the transfers of funds truly were loans.  Beaver v. Commissioner, 55 T.C. 85, 91 (1970).

McGirl made up the numbers he provided Mr. Lauth to prepare the Yogurt Station's corporate tax returns. At trial, petitioners put into evidence check spreads that summarized their business checking account activity by year.[11] Other than for attorney's fees, petitioners failed to provide any invoices, receipts, or other documentary evidence to substantiate the claimed increased deductions. Petitioners testified at trial as to the business purpose of checks to most payees. We must decide if the check spreads, coupled with petitioners' testimony, adequately substantiate the increased expenses.

We note at the outset that petitioners do not wish to substitute their check spread category totals for all the deductions claimed on the Yogurt Station's corporate tax returns; they only want to substitute selected categories. This selective use of the check spread ignores the expenses on the Yogurt Station's corporate tax returns that are greater than the check spread totals. For example, the Yogurt Station's 1989 corporate tax return has a deduction of $8,478 for taxes; the 1989 check spread lists total taxes of $6,618.

There are basic problems with the check spreads. Without receipts, we are left with petitioners' self-serving testimony

---

[11] Respondent made a hearsay objection to petitioners' introduction of the check spreads into evidence. This objection was renewed on brief. As a practical matter, when the substantiation of 3 years of expenses is at issue and copies of all checks are in evidence, summarizing the check activity does assist the Court. Fed. R. Evid. 1006. We shall treat these check spreads prepared by petitioners as admissible evidence.

to identify what was purchased and whether it was for business or personal use.  One of the Yogurt Station's largest suppliers, Sam's Wholesale Club, is well known for selling nonfood items. Petitioners wish to deduct as rent three checks payable to Cherokee State Bank, which is both the Yogurt Station's and petitioners' personal bank.  There were no leases, documents, or nonparty testimony explaining why checks were made payable to Cherokee State Bank.  Petitioners wish to deduct checks, some of which are in excess of $1,000, payable to individuals and to cash for maintenance and repair.  Without supporting documentation, deductions for checks written to cash and to individuals are highly suspect.

Petitioners claim to have underreported the Yogurt Station's payment of compensation and wages; the amount allegedly underreported for 1989 is $6,262.  The 1989 check spread shows that petitioners were paid $6,936 more than the amount reported on their return.[12]  Petitioners want the Yogurt Station to have an increased deduction for wages, although they have failed to personally report a corresponding increase in wages.  Their claim to the additional deduction has not been substantiated.

Petitioners wish to claim deductions for equipment purchases; it is a separate category on the check spreads.

---

[12] On their respective 1989 returns, petitioners reported $13,925 as wages from the Yogurt Station and it deducted a like amount.  However, the check spread indicates that the Yogurt Station paid petitioners $20,861 in 1989.

Generally, there is no deduction for the purchase of equipment. On a timely filed tax return, subject to limitations, a taxpayer can elect to treat the cost of section 179 property as an expense. To avail oneself of the benefits of section 179, the taxpayer must make an irrevocable election on the tax return. Sec. 179(a), (c). Petitioners made no such election. In order to depreciate an asset, there must be evidence that it was put into service during the year in question for use in a trade or business. Petitioners offered no such evidence.

Although the Yogurt Station's tax returns had no deduction for auction expenses,[13] petitioners seek to deduct checks made payable to cash under this category. Petitioners have not met their burden of showing that this side business existed.

After carefully reviewing the 1989, 1990, and 1991 check spreads, based on the observations made above, we conclude that they are unreliable as substantiation for additional expenses. Based on the record as a whole, and as discussed below, we find that petitioners' testimony lacks credibility. The check spreads are simply too little, too late. In fact, were we to rely on them, we would allow petitioners fewer total deductions than respondent has already allowed in her notice of deficiency. We find insufficient evidence in the record to justify allowance of any deductions in excess of those claimed on the Yogurt Station's

---

[13] The store's returns made no mention at all of an auction (sale of used restaurant equipment) business.

tax returns; petitioners have failed to prove the Yogurt Station's entitlement to additional deductions for unclaimed business expenses. Accordingly, we sustain respondent's determination of the deficiencies for 1989, 1990, and 1991.

4. Civil Fraud Penalty

The addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from a taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938). Respondent has the burden of proving, by clear and convincing evidence, an underpayment for each year and that some part of the underpayment was due to fraud. Sec. 7454(a); Rule 142(b); Katz v. Commissioner, 90 T.C. 1130, 1143 (1988); Otsuki v. Commissioner, 53 T.C. 96, 105 (1969). If respondent establishes that any portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud and subjected to a 75-percent addition to tax or penalty, except with respect to any portion of the underpayment that the taxpayer establishes is not attributable to fraud. Sec. 6663(b).

Fraud is intentional wrongdoing on the part of the taxpayer with the specific purpose to evade a tax believed to be owing. McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). The existence of fraud is a question of fact to be resolved from the entire record. Gajewski v.

<u>Commissioner</u>, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Respondent's burden is met if she shows that petitioners intended to evade taxes known to be owing by conduct intended to conceal income, mislead, or otherwise prevent the collection of taxes. <u>Stoltzfus v. United States</u>, 398 F.2d 1002, 1004 (3d. Cir. 1968); <u>Rowlee v. Commissioner</u>, 80 T.C. 1111, 1123, (1983). Respondent must meet this burden through affirmative evidence because fraud is never imputed or presumed. <u>Toussaint v. Commissioner</u>, 743 F.2d. 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25; <u>Beaver v. Commissioner</u>, 55 T.C. 85, 92 (1970). Petitioners' entire course of conduct can be indicative of fraud. <u>Stone v. Commissioner</u>, 56 T.C. 213, 224 (1971); <u>Otsuki v. Commissioner</u>, <u>supra</u> at 105-106.

A. <u>Underpayment of Tax</u>

Even if all of petitioners' arguments regarding additional unclaimed deductions and alleged loans were accepted, there would still be an underreporting of income in 1990 and 1991. This underreporting would give rise to an underpayment of tax for both 1990 and 1991. Therefore, we next consider whether respondent has shown an underpayment for 1989 as well.

The Commissioner can satisfy her burden of proving the first prong of the fraud test; i.e., an underpayment, when the allegations of fraud are intertwined with unreported and reconstructed income in one of two ways. The Commissioner may prove an underpayment by proving a likely source of the

unreported income.  <u>Holland v. United States</u>, 348 U.S. 121 (1954); <u>Parks v. Commissioner</u>, 94 T.C. 654, 661 (1990). Alternatively, where the taxpayer alleges a nontaxable source, the Commissioner may satisfy her burden by disproving the nontaxable source so alleged.  <u>United States v. Massei</u>, 355 U.S. 595 (1958); <u>Parks v. Commissioner</u>, <u>supra</u>.

We find that respondent has proven by clear and convincing evidence a likely source of the underreported deposits; i.e., that they are income from the Yogurt Station's business.

We also find that respondent has disproved, by clear and convincing evidence, the nontaxable source alleged by petitioners.  Mr. McGirl's explanation of loans from Mr. McAllister is implausible and incredible.  The McAllister loans were supposedly included in the Yogurt Station's deposits.  In 1991, the alleged loans were only $7,000, yet the Yogurt Station's deposits substantially increased from the previous year when the alleged loans were $30,500.  This inconsistency was not explained by petitioners.  Mr. McAllister's testimony was vague and incredible.  Further, we find it implausible that Mr. McAllister would have a $25,000 cash hoard given his financial situation during the years in question.  Thus, respondent has proven, by clear and convincing evidence, that an underpayment of tax existed with respect to each of the years under

consideration.[14]

B. Fraudulent Intent

Next, respondent must prove that a portion of such underpayment was due to fraud. Professional Servs. v. Commissioner, 79 T.C. 888, 930 (1982).

Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence and reasonable inferences may be drawn from the relevant facts. Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). An intent to conceal or mislead may be inferred from a pattern of conduct, Spies v. United States, supra at 499, or from a taxpayer's entire course of conduct, Stone v. Commissioner, 56 T.C. 213, 223-224 (1971).

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent. These badges of fraud include: (1) Understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of income or assets, (6) failing to cooperate with tax authorities, (7) engaging in illegal activities, (8) an

---

[14] Since petitioners' alleged additional expenses are less than the unreported income for each of the years in issue, we need not concern ourselves with the line of cases that state that even in criminal tax evasion cases where the Government bears the burden of proof beyond a reasonable doubt, "evidence of unexplained receipts shifts to the taxpayer the burden of coming forward with evidence as to the amount of offsetting expenses, if any." Siravo v. United States, 377 F.2d 469, 473 (1st Cir. 1967).

intent to mislead which may be inferred from a pattern of conduct, (9) lack of credibility of the taxpayer's testimony, (10) filing false documents, and (11) dealing in cash. See Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors constitutes persuasive evidence. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603. We note that some conduct and evidence can be classified under more than one factor. The sophistication, education, and intelligence of the taxpayer are relevant to this determination. Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).

a. Petitioners' Sophistication and Experience

Mr. McGirl attempts to counter evidence of fraud with the defense that he had no accounting or bookkeeping training and was ignorant as to all recordkeeping and tax reporting requirements. We are not impressed with Mr. McGirl's attempt to characterize himself as an inexperienced and unknowledgeable business person. Mr. McGirl has a college education. He operated a restaurant before petitioners started the Yogurt Station. The record shows that he managed to accumulate more than $112,000 in savings in just 3 years of the Yogurt Station's operation. Even if we were to believe in Mr. McGirl's naivete, which we do not, the record

is still replete with indica of fraud on his part.

b. Consistent and Substantial Understatements of Income

The mere failure to report income is not sufficient to establish fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; Parks v. Commissioner, supra at 664. However, consistent and substantial understatement of income may be strong evidence of fraud. Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). Moreover, a pattern of consistent underreporting of income, when accompanied by other circumstances indicating an intent to conceal income, justifies the inference of fraud. Holland v. United States, 348 U.S. 121, 137 (1954). Even if we were to subtract the alleged loans, petitioners have admitted to understating the Yogurt Station's gross income in the amounts of $24,310, $60,874, and $80,499 for 1989, 1990, and 1991, respectively. These understatements are both consistent and substantial; they are evidence of fraud.

c. Failure to Maintain Adequate Books and Records

Failure to maintain adequate books and records of income is indicative of fraud. Truesdell v. Commissioner, 89 T.C. 1280, 1302 (1987); Gajewski v. Commissioner, 67 T.C. at 200. Although Mr. McGirl had owned and operated a restaurant for over a decade, he claims that invoices, receipts, and cash register tapes were

treated as "garbage". Petitioners kept no books or records, much less adequate ones. Mr. McGirl attempts to blame his tax return preparer for failing to instruct him on bookkeeping requirements when, in fact, he requested no such instruction. Mr. McGirl always claimed to have support for the expense and income numbers listed on the summary sheets given to the tax return preparer. No evidence has been presented to show that the Yogurt Station's corporate tax returns did not accurately reflect the information provided to the tax return preparer. Although Mrs. McGirl wrote down the daily sales figure and gave it to Mr. McGirl, he promptly discarded it. Mr. McGirl's destruction of the Yogurt Station's business records is evidence of fraud.

### d. Implausible or Inconsistent Explanations of Behavior

Mr. McGirl has made many implausible and inconsistent statements. We find Mr. McGirl's claims to be self-serving and, at least in part, incredible. A partial listing of such implausible or inconsistent testimony and behavior follows:

(a) Mr. McGirl's auto logs purport to show 100 percent business usage of his automobile;

(b) Mr. McGirl purported to keep detailed auto logs while discarding other business records;

(c) Mr. McGirl testified that the cash register was dropped in the first year of the Yogurt Station's existence and was never repaired or replaced. Although he amassed more than $112,000 in savings, Mr. McGirl testified that it was not economically

feasible to get the cash register repaired, and petitioners never replaced it;

(d) Mr. McGirl testified to and offered into evidence a loan summary which shows 101 separate loans over a 3-year period. At all times, petitioners had more in savings than they allegedly owed. According to petitioners' exhibits, a $1,000 check was written on February 21, 1989, to their savings account. Yet 2 days later, on February 23, 1989, Mr. McGirl allegedly borrowed $1,000 from Mr. McAllister. On July 7, 1989, Mr. McGirl wrote a $1,500 check for deposit into the savings account and then supposedly borrowed $1,000 on the same day. This pattern of borrowing money shortly after depositing money into savings is repeated over the 3-year period.

(e) Mr. McGirl claimed that he did not make up the numbers on the Yogurt Station's corporate tax returns, but instead "guesstimated" them. According to Mr. McGirl, a guesstimate is a number that he believes is accurate, erring on the conservative side. Mr. McGirl's guesstimates of income and expense, when considered as a whole, showed a net loss over a 3-year period while petitioners accumulated more than $112,000 in savings. When questioned by Ms. Berg as to how he came up with the numbers, Mr. McGirl said "he just guessed, he pulled the numbers 'out of the air.'"

(f) Mr. McGirl testified that he saw no need to keep records, receipts, invoices, cash register receipts, leases, or any other business records.

Any one statement might be overlooked or rationalized, but the cumulative effect of such testimony is indicative of fraud on the part of Mr. McGirl.

### e. Intent to Mislead

Misleading statements to an investigating agent may be evidence of fraud. Gajewski v. Commissioner, supra at 200. Mr. McGirl admits that he fabricated IOU's and gave them to his representative while he was being audited by the MDR. In hopes of avoiding a State audit, Mr. McGirl told Ms. Berg that the Yogurt Station had no checking account and that he paid all bills by cash.

### f. Lack of Credibility of Mr. McGirl's Testimony

A taxpayer's lack of credibility, inconsistent testimony, or evasiveness are factors in considering the fraud issue. Toussaint v. Commissioner, 743 F.2d at 312. Although Mr. McGirl had operated two restaurants and was responsible for their finances, he testified "I am not even sure I know--if I know what an invoice is." Petitioners amassed more than $112,000 in savings. Monthly brokerage statements were entered into evidence that clearly show the magnitude of their savings. Mr. McGirl wrote checks almost weekly on the business checking account to the savings account during the years in question; the checks were for $1,000 to $5,000 each. Petitioners' own check spreads detail and total the amounts put into the savings account. Yet, the following colloquy took place between Mr. McGirl and respondent's attorney at trial:

Q    Now, during the time period that is the
     subject of this case, 1989 through 1991, you
     had an account with Dean Witter, a liquid
     asset fund, didn't you?

A    Yes.

Q    And you made some deposits to that account
     over the course of those three years?

A    Yes.

Q    Can you estimate for me what the amount of
     those deposits were?

A    I couldn't possibly.

Q    Would you say it is closer to $100, $1,000,
     $10,000, $100,000?

A    I made those deposits.  I believe I told Mike
     [Mr. McAllister] I was doing it on a monthly
     basis.  This is the money that was earmarked
     to repay Mike.  The amount, I have no idea.

Q    You have no idea how much you put into this
     liquid assets account?

A    I have no idea.

Mr. McGirl's auto logs, for the reasons detailed above, show his
lack of credibility.  Both Mr. and Mrs. McGirl testified that the
cash register broke in the first year of the Yogurt Station's
operation and that they never had it repaired.  The cash register
supposedly was unreliable because it would randomly repeat
entries.  However, when Mr. McGirl was being investigated by Mr.
Erickson, a criminal investigator for the MDR, seven former
Yogurt Station employees provided affidavits that stated that the
cash register worked properly, and that it did not repeat
entries.  After the MDR audit was underway, Mr. McGirl told Mr.

Lauth, his tax return preparer, that he had unreported income and that it had been going on for some time.

Mr. McGirl testified that he conservatively "guesstimated" the store's gross income and expenses. Mr. McGirl's guesstimates of gross income and expense were so far off the mark that we conclude that they were not good faith estimates at all. Even if we were to believe the loan story, petitioners still saved more than $38,000 in excess of the alleged loan proceeds. Even when the alleged loans ended, the Yogurt Station's deposits kept increasing.

Mr. McGirl testified that: (1) He did not know if he was the sole owner of Mickey's Diner; (2) he had no idea if his corporation had stock; (3) he cannot remember the name on the Yogurt Station's tax return; and (4) neither the MDR or the IRS auditors ever asked to see his auto logs. The above statements, when taken as a whole, show Mr. McGirl's lack of credibility and are evidence of fraud.

### g. Dealing in Cash

Mr. McGirl testified that his purported side business and alleged borrowings were transacted exclusively in cash. The existence of cash transactions is difficult to disprove. However, the exclusive use of cash when conducting business transactions, when coupled with a lack of recordkeeping, is evidence of fraud.

### h. Other factors

We also consider it significant that Mr. McGirl pleaded

guilty to State sales tax violations. Although this conviction does not, in and of itself, establish a fraudulent intent, we consider the crime evidence of a propensity to defraud. Petzoldt v. Commissioner, 92 T.C. at 701-702 (1989), McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).

To summarize, after carefully reviewing all of the facts and circumstances present in this record, we conclude that respondent has clearly and convincingly proven that an understatement of tax for 1989, 1990, and 1991 was due to fraud on the part of Mr. McGirl. Petitioners have failed to show that any portion of the underpayment was not due to fraud. Therefore, we sustain respondent's determination that Mr. McGirl is liable for the penalty for fraud under section 6663(a) for all of the years under consideration.

C. Mrs. McGirl Not Liable for Fraud

Mrs. McGirl's testimony was not fully credible. Her support of Mr. McGirl's statement that the cash register was broken and that it was economically infeasible to repair it demonstrates that part of her testimony was not plausible.

Fraud is never presumed or imputed; it must be established by independent evidence that establishes a fraudulent intent on the taxpayer's part. Otsuki v. Commissioner, 53 T.C. at 106. Even if Mrs. McGirl's testimony is not credible in all respects, we may still be left with no more than a suspicion of fraud. See Jenkins v. Commissioner, T.C. Memo. 1995-563. We shall not

sustain respondent's determination of fraud when we are only left with a suspicion of fraud. Green v. Commissioner, 66 T.C. 538, 550 (1976); see Comparato v. Commissioner, T.C. Memo. 1993-52. Fraud cannot be imputed from one spouse to another. Sec. 6663(c).[15]

Respondent has failed to show that Mrs. McGirl was responsible for understating income, destroying the Yogurt Station's invoices and records, misleading the MDR or IRS agents, or that she was in any way involved in creating the fabricated auto logs.

Respondent has not affirmatively established, by clear and convincing evidence, that Mrs. McGirl intended to evade taxes. We cannot conclude on this record that Mrs. McGirl committed fraud where respondent has failed to adduce evidence showing intentional wrongdoing.

5. Negligence Penalty on Unreported Taxable Dividends

Petitioners admit they omitted the dividend income from their joint Federal income tax returns. Petitioners have offered no evidence that they were not negligent or had reasonable cause to omit the dividend income. In fact, petitioners' briefs fail to address the negligence issue at all. We cannot be sure if

---

[15] Since we have upheld respondent's determination of fraud with respect to Mr. McGirl, we cannot also find him liable for negligence. Therefore, we cannot find Mrs. McGirl liable for negligence as she filed a joint return with Mr. McGirl and he would be jointly liable for any negligence penalty imposed on his wife. See Aflalo v. Commissioner, T.C. Memo. 1994-596.

petitioners intended to abandon the issue, but in any case respondent's determination of the applicable penalty as to these items must be sustained as petitioners have failed to satisfy their burden of proof on this issue.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.